IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DANIEL E. BRANNEN, | : | |
| Plaintiff | : | No. 1:17-cv-00714 |
| | : | |
| v. | : | (Judge Kane) |
| | : | |
| BRITISH AIRWAYS PLC and | : | |
| VIKING RIVER CRUISES, INC., | : | |
| Defendants | : | |

## MEMORANDUM

Before the Court are Defendants British Airways PLC ("British Airways"), and Viking River Cruises, Inc.'s ("VRC"), motions to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). (Doc. Nos. 7, 22.) For the reasons that follow, the Court will grant both motions.

**I.      BACKGROUND**[1]

Plaintiff Daniel E. Brannen ("Brannen") initiated the above-captioned action by filing a complaint against Defendants in this Court on April 21, 2017. (Doc. No. 1.) Brannen's allegations stem from an incident that took place on November 1, 2015, at Heathrow Airport in the United Kingdom. (Id. at ¶ 20.) Brannen and his wife were traveling from Newark International Airport in Newark, New Jersey to Marseilles, France on a British Airways flight as part of a European cruise vacation arranged through VRC, and they stopped at Heathrow Airport before boarding a connecting British Airways flight to Marseilles. (Id. at ¶¶ 18-20.) While Brannen was boarding an inter-terminal bus to travel from one terminal of the Heathrow Airport to another for his connecting flight, he suffered an injury to his shin, which resulted in cellulitis and an infection in his left leg. (Id. at ¶¶ 24, 27, 37.)

---

[1] The relevant facts are taken from Brannen's complaint. (Doc. No. 1.) The Court limits its discussion of the factual background of this case only to those factual allegations relevant for purposes of deciding the motions presently before the Court.

1

In the complaint, Brannen avers that on October 31, 2015, he and his wife traveled on British Airways flight 188 from Newark International Airport in Newark, New Jersey, and arrived at Heathrow Airport in the United Kingdom on November 1, 2015. (Id. at ¶ 20.) Brannen and his wife allegedly disembarked from terminal 5 at Heathrow airport and proceeded to terminal 3 "to embark on their scheduled connecting flight to Marseilles, France." (Id. at ¶ 21.) Subsequently, "[a]t terminal 3, a British Airways agent told Mr. and Mrs. Brannen that their British Airways connecting flight was canceled," and the airline agent "instead arranged for Mr. and Mrs. Brannen to travel to Brussels, Belgium, on Brussels Airlines, SN flight 2096, and then on SN 3603 from Brussels to Marseilles" on November 1, 2015. (Id.) When Brannen communicated with the agent from British Airways, the agent provided "an e-ticket receipt for flights 2096 and 3606, and specifically instructed Mr. and Mrs. Brannen immediately to travel from terminal 3 to terminal 4, using the airport's inter-terminal transfer bus system, to get their boarding passes and embark on Brussels Airlines, SN flight 2096." (Id. at ¶ 22.) Brannen and his wife then "followed the British Airway[s] agent's instructions, for the immediate purpose of embarking" on the flight to Brussels. (Id. at ¶ 23.)

When the inter-terminal bus arrived "[a]t the transfer bus stop at terminal 3, the bus stopped too far from the curb," and "[p]assengers began boarding by stepping directly from the curb onto the bus, which required a long step." (Id. at ¶ 24.) Brannen, "an elderly man with arthritis in his right foot," uses a cane to assist him in walking and "was using his cane when he tried to board the bus." (Id. at ¶ 26.) Brannen alleges that "[b]ecause the bus stopped too far from the curb," he "stepped forward with his good, left foot, but the foot slipped off the bus as he tried to board, causing him to hit his shin on the bus ledge, which then caused him to fall backward." (Id. at ¶ 27.) After arriving at terminal 4, Brannen and his wife then proceeded to

2

the Brussels Airlines counter to obtain their boarding passes and "to continue embarking," when an airline representative "informed them that this flight was canceled too." (Id. at ¶ 29.) When they "returned to terminal 3 to the British Airways transfer desk, to get new flight instructions," Brannen and his wife "were told they could not get a flight until the following day." (Id. at ¶ 30.)

After returning to the hotel at the airport that evening, Brannen "discovered a large bruise and hematoma on his left shin," and when he returned to the United States at the conclusion of his vacation, he met with a podiatrist as a result of a previously-scheduled appointment on November 10, 2015. (Id. at ¶¶ 31, 35.) The podiatrist "was concerned by the hematoma," and as a result, instructed Brannen to proceed "to the hospital immediately for an ultrasound to check for blood clots," and the ultrasound showed no blood clots. (Id. at ¶ 36.) In addition, the podiatrist recommended that Brannen meet with a primary care doctor in regard to his injury. (Id.) On the same day, Brannen's primary care physician "diagnosed cellulitis and a serious infection in the injured left leg." (Id. at 37.) Brannen also asserts that he has incurred medical expenses and lost wages, and that he has suffered pain and "permanent disfiguration."[2] (Id. at ¶¶ 38-40.)

Brannen's two-count complaint sets forth strict liability claims against VRC and British Airways under the Montreal Convention. (Id. at 8-9.) The bases for Brannen's claims under the Montreal Convention are that VRC "was a contracting carrier under Articles 39 and 40 of the Montreal Convention," British Airways "was an actual carrier, and/or was a contracting carrier,

---

[2] Brannen states that "[h]is total medical expenses were about . . . $22,768.97," as a result of receiving "three rounds of antibiotics for bacteria," and "daily use of a KCI VAC pump, 24 hours daily," for various time periods during December of 2015 and January of 2016. (Id. at ¶ 38.) In addition, Brannen, who is employed as a substitute teacher, asserts that he has incurred lost wages of $5,510.00 because of his inability "to work due to his injury from November 2015 through February 2016." (Id. at ¶ 39.)

under Articles 39 and 40 of the Montreal Convention," and that "[t]he accident that caused Mr. Brannen's injury took place in the course of the operations of his disembarking from British Airways flight 188 . . . [and] embarking on Brussels Airlines flight 2096." (Id. at ¶¶ 43-45, 52-54.)

On May 24, 2017, British Airways filed a motion to dismiss for failure to state a claim upon which relief may be granted under Federal Rule of Civil Procedure 12(b)(6). (Doc. No. 7.) On June 22, 2017, VRC also filed a motion to dismiss pursuant to Rule 12(b)(6). (Doc. No. 22.) Both motions have been fully briefed and are now ripe for disposition.

## II. LEGAL STANDARD

Federal notice and pleading rules require the complaint to provide the defendant notice of the claim and the grounds upon which it rests. Phillips v. Cnty. of Allegheny, 515 F.3d 224, 232 (3d Cir. 2008). The plaintiff must present facts that, accepted as true, demonstrate a plausible right to relief. Fed. R. Civ. P. 8(a). Although Federal Rule of Civil Procedure 8(a)(2) requires "only a short and plain statement of the claim showing that the pleader is entitled to relief," a complaint may nevertheless be dismissed under Federal Rule of Civil Procedure 12(b)(6) for its "failure to state a claim upon which relief can be granted." See Fed. R. Civ. P. 12(b)(6).

When ruling on a motion to dismiss under Rule 12(b)(6), the Court must accept as true all factual allegations in the complaint and all reasonable inferences that can be drawn from them, viewed in the light most favorable to the plaintiff. See In re Ins. Brokerage Antitrust Litig., 618 F.3d 300, 314 (3d Cir. 2010). The Court's inquiry is guided by the standards of Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), and Ashcroft v. Iqbal, 556 U.S. 662 (2009). Under Twombly and Iqbal, pleading requirements have shifted to a "more heightened form of pleading." See Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009). To prevent

4

dismissal, all civil complaints must set out "sufficient factual matter" to show that the claim is facially plausible. Id. The plausibility standard requires more than a mere possibility that the Defendant is liable for the alleged misconduct. As the Supreme Court instructed in Iqbal, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to relief.'" Iqbal, 556 U.S. at 679 (citing Fed. R. Civ. P. 8(a)(2)).

Accordingly, to determine the sufficiency of a complaint under Twombly and Iqbal, the United States Court of Appeals for the Third Circuit has identified the following steps a district court must take when determining the sufficiency of a complaint under Rule 12(b)(6): (1) identify the elements a plaintiff must plead to state a claim; (2) identify any conclusory allegations contained in the complaint "not entitled" to the assumption of truth; and (3) determine whether any "well-pleaded factual allegations" contained in the complaint "plausibly give rise to an entitlement to relief." See Santiago v. Warminster Twp., 629 F.3d 121, 130 (3d Cir. 2010) (citation and quotation marks omitted).

In ruling on a Rule 12(b)(6) motion to dismiss for failure to state a claim, "a court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." Mayer v. Belichick, 605 F.3d 223, 230 (3d Cir. 2010) (citing Pension Benefit Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993)). A court may also consider "any 'matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, [and] items appearing in the record of the case.'" Buck v. Hampton Twp. Sch. Dist., 452 F.3d 256, 260 (3d Cir. 2006) (quoting 5B Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 1357 (3d ed. 2004)).

## III. DISCUSSION

In support of its motion, British Airways argues that the Montreal Convention is inapplicable because Brannen's injuries did not occur "during the operations of embarking, disembarking or on board an international flight." (Doc. No. 11 at 6.) VRC similarly asserts that dismissal of the complaint is warranted because "the injury giving rise to [Brannen's] claims [did not] occur on board or during the operations of embarking or disembarking an international flight, as required by Article 17 of the Montreal Convention."[3] (Doc. No. 22 at 2.) The Court will first address whether Brannen was engaged in embarking or disembarking from the aircraft when he was injured and, thus, whether Brannen is able to state a claim under the Montreal Convention.

### A. Legal Standard Applicable to Determining Liability Under the Montreal Convention

The Montreal Convention is an international agreement that, inter alia, amended portions of the Warsaw Convention and allows for the imposition of strict liability on air carriers whose passengers suffer injuries in connection with international flights.[4] See, e.g., Air France v. Saks, 470 U.S. 392, 392 (1985). Specifically, Article 17 of the Warsaw Convention, as amended by the Montreal Convention ("Article 17"), provides that a carrier "shall be liable for damage

---

[3] VRC alternatively argues that Brannen has not alleged sufficient facts to establish that "VRC was acting as an air carrier, and was, therefore, subject to the Montreal Convention," or that Brannen's injury "was the result of an 'accident' as required to state a claim for relief under Article 17 of the Montreal Convention." (Doc. No. 22 at 2.) VRC further asserts that the complaint should be dismissed because the passenger ticket contract between Brannen and VRC provides that any dispute arising from the agreement between Brannen and VRC be litigated in a court in Los Angeles County, California and be governed by California law. (Id. at 12.)

[4] As the Supreme Court noted in Air France, the Montreal Agreement is "a private agreement among airlines that has been approved by the Federal Government" in connection with the Warsaw Convention, an international treaty pertaining to liability of air carriers for international passengers' injuries. See Air France v. Saks, 470 U.S. 392, 392 (1985). Consistent with the parties' references to the Montreal protocol at issue, the Court will use the term "Montreal Convention" to refer to the Montreal Agreement and its relevant amendments to the Warsaw Convention.

sustained in the event of . . . [a] bodily injury suffered by a passenger if the accident which caused the damage so sustained took place on board the aircraft <u>or in the course of any of the operations of embarking or disembarking</u>." <u>Evangelinos v. Trans World Airlines, Inc.</u>, 550 F.2d 152, 154 (3d Cir. 1977).

In <u>Evangelinos v. Trans World Airlines</u>, the Third Circuit recognized a three-part analysis for examining whether a passenger's injuries were incurred while embarking or disembarking from an aircraft for purposes of imposing liability under Article 17. <u>Id.</u> at 155. The <u>Evangelinos</u> plaintiffs were injured during a terror attack at an airport in Athens, Greece, while in the process of boarding a New York-bound flight. <u>Id.</u> at 154. Applying a three-part test to determine whether Article 17 liability was appropriate, the court concluded that consideration of the location of the accident, the activity in which the passengers were engaged at the time of the injury, and the defendant's control over the passengers rendered summary judgment in favor of the airline carrier improper. <u>Id.</u> at 158. The Third Circuit reasoned that "at the time of the attack, the plaintiffs had completed virtually all the activities required as a prerequisite to boarding, and were standing in line at the departure gate ready to proceed to the aircraft. The plaintiffs' injuries were sustained while they were acting at the explicit direction of [the airline], and while they were performing the final act required as a prerequisite to boarding busses employed by [the airline] to take the Evangelinos family to the aircraft." <u>Id.</u> at 156. Moreover, the court concluded that the location of the incident and the level of control exercised by the airline over the passengers could warrant liability, as the passengers "were congregated in a specific geographical area designated by [the airline] and were identifiable as a group associated with Flight 881" and the airline assumed control over the group of passengers when it announced the group and directed the passengers "to stand near the departure gate." <u>Id.</u>

7

Specifically, the Third Circuit requires a district court assessing liability under Article 17 to consider "the location of the accident, the activity in which the injured person was engaged, and the control by defendant of such injured person at the location and during the activity taking place at the time of the accident alleged to be 'in the course of any of the operations of embarking.'" Id. at 155 (footnote omitted). The Third Circuit has emphasized that "[w]hile control remains at least equally as important as location and activity, it is an integral factor in evaluating both location and activity." Id. The Court considers each factor in turn.

### 1. Location of the Incident Giving Rise to Brannen's Complaint

The parties dispute the effect that the location of the incident has on Brannen's ability to state a viable claim against either Defendant under the Montreal Convention.[5] In support of its motion, British Airways argues that Brannen "was not near any point of boarding when the [i]ncident took place . . . [as Brannen] claims he was injured in an area outside of Terminal 3, while he was attempting to board a shuttle bus to flight SN 2096." (Doc. No. 11 at 9.) In response, Brannen, relying on the Third Circuit's remark in Evangelinos that that the location factor, alone, is not dispositive in the applicable three-part inquiry, insists that "[t]he fact that Mr. Brannen was not at the boarding gate does not defeat his claim." (Doc. No. 27 at 11.) Further, Brannen urges the Court to look to a recent decision outside the Third Circuit in which the

---

[5] With respect to certain arguments regarding the applicability of the Montreal Convention to Brannen's claims, "VRC adopts and relies upon the legal arguments set forth in the [m]otion to [d]ismiss and supporting memorandum of law filed by . . . British Airways." (Doc. No. 22 at 9.) Accordingly, where appropriate, the Court will refer to such arguments from British Airways' briefs in support of its motion but will also recognize that such arguments may apply to VRC's motion as well.

district court concluded that accidents occurring "during inter-terminal transportation at Heathrow," were not necessarily "excluded from Article 17 liability."[6] (Id. at 12.)

The Court agrees with Defendants that it is clear from the allegations in the complaint that Brannen was not in the course of embarking or disembarking from an aircraft as is required to subject Defendants to Article 17 liability. Rather, as stated in his complaint, Brannen was "[a]t the transfer bus stop at terminal 3 [when] the bus stopped too far from the curb" and he was injured while attempting to board the bus. (Doc. No. 1 at ¶¶ 24-25.) Unlike the plaintiffs in Evangelinos, who "had completed virtually all the activities required as a prerequisite to boarding, and were standing line at the departure gate ready to proceed to the aircraft," Evangelinos, 550 F.2d at 156, in this case, the complaint's allegations reveal that Brannen was not in line waiting to board the aircraft when he sustained the injury to his leg. Rather, his injury occurred before he arrived at terminal 4 and obtained his boarding pass. (Doc. No. 1 at ¶¶ 24, 29).

Other courts have concluded under similar circumstances that passengers' locations were insufficient to warrant the imposition of Article 17 liability. See Buonocore v. Trans World Airlines, Inc., 900 F.2d 8, 10 (2d Cir. 1990) (stating that plaintiff "had ample time to roam freely about the terminal before his flight was called" and "had only checked in at the ticket counter and was in the public area near a snack counter"); Kantonides v. KLM Royal Dutch Airlines, 802

---

[6] Brannen argues that Adelson v. American Airlines, Inc. is instructive. In Adelson, the district court discussed the applicability of Article 17 to "injuries occurring inside airport terminals" and emphasized the importance of assessing the "total circumstances" when deciding whether Article 17 governs an injury in a certain area of an airport. Adelson v. Am. Airlines, Inc., No. C. 17-00548 WHA, 2017 WL 2265459, at *5 (N.D. Cal. May 24, 2017). However, the court granted the defendants' motion for judgment on the pleadings because "Adelson fail[ed] to establish under these three factors, or any other circumstances, that he was engaged in the operations of embarking or disembarking as understood by our court of appeals in interpreting Article 17," and that "[t]o find otherwise would go beyond the intended meaning of Article 17." Id.

9

F. Supp. 1203, 1210-11 (D.N.J. 1992) (acknowledging that plaintiffs "lacked the proximity to the gate and the immediacy of boarding of the plaintiffs in Evangelinos" and they "had not yet been segregated into an area supervised by [airline] personnel"). Although Brannen's complaint and opposition briefs state that Brannen was traveling between terminals with the "immediate" purpose of boarding the connecting flight, the Court concludes that Brannen's complaint does not allege sufficient facts to suggest that the connecting flight was prepared to leave imminently or that all other passengers were on board. Rather, Brannen indicates that the first connecting flight, on which he claims he was in the process of embarking at the time of the injury, was, in reality, canceled. (Doc. No. 1 at ¶ 29.) In addition, Brannen was injured in a location that was accessible to other passengers and was not, according to the facts alleged in the complaint, any type of exclusive area. See Abu Hamdeh v. Am. Airlines, Inc., 862 F. Supp. 243, 247-48 (E.D. Mo. 1994) (acknowledging that "the location of the accident does not dictate a conclusion that plaintiff was engaged in the course of the operations of embarking" when plaintiff fell in a public terminal and was "not under any immediate supervision" by airline). Accordingly, the Court finds that the location of the injury weighs in favor of granting Defendants' motions to dismiss.

### 2. Control by Defendants over Brannen at the Time of the Incident

As it relates to the next factor, control, the parties disagree as to the level of control exercised by British Airways over Brannen at the time of the injury. Brannen maintains that, at the time of the injury, he was under the control of British Airways because the airline "specifically instructed Mr. and Mrs. Brannen immediately to travel from terminal 3 to terminal 4, using the airport's inter-terminal transfer bus system, to get their boarding passes and embark on Brussels Airlines, SN flight 2086," with the bus system serving as "a servant or agent of British Airways for the process of embarking." (Doc. No. 27 at 8.) Defendants argue that

10

offering directions as to how to proceed through the terminal using the shuttle bus does not demonstrate control by Defendants over Brannen "because the act of boarding the shuttle bus is far removed from any boarding process." (Doc. No. 11 at 11.) Defendants further assert that "[u]nlike the plaintiffs in Evangelinos," Brannen "was not boarding a shuttle bus that would take him directly to the aircraft, but instead was on his way from one terminal to another," and that "British Airways was not taking responsibility for Plaintiffs . . . because neither the shuttle bus nor its operations is controlled by British Airways." (Id.)

The Court finds Brannen's position that he was acting under the control of the airline for purposes of Article 17 unavailing, as Brannen's case is distinguishable from Evangelinos. There, the defendant-airline had possessed the requisite amount of control over the plaintiffs because the airline had announced the flight, formed a group of passengers and directed them "as a group to stand near the departure gate," and "caused them to congregate in an area and formation directly and solely related to embarkation on [the flight]." Evangelinos, 550 F.2d at 156. Here, Brannen's complaint alleges only that a British Airways employee "instructed [Plaintiffs] immediately to travel from terminal 3 to terminal 4, using the airport's inter-terminal transfer bus system, to get their boarding passes," and that Brannen and his wife "followed the British Airway's agent's instruction, for the immediate purpose of embarking on [the flight]." (Doc. No. 1 at ¶¶ 22-23.) Accordingly, the facts alleged by Brannen do not permit the Court to conclude that Plaintiffs, pursuant to the airline's instructions, "were congregated in a specific geographical area designated by [the airline] and were identifiable as [part of] a group associated with" the flight in question. Evangelinos, 550 F.2d at 156. Rather, at the point at which the injury occurred, Brannen was not within the ambit of British Airways' control so as to trigger the

imposition of liability under Article 17.[7] Therefore, the Court concludes that Brannen's complaint does not include sufficient facts with respect to the "control" factor of the three-pronged governing analysis.

### 3. Activity in which Brannen was Engaged at the Time of the Incident

As to the third factor, which requires the Court to assess Brannen's activity at the time of the injury, Defendants assert that "the nature of [the] activity that the plaintiff was engaged in at the time of the incident is relevant to the embarkation/disembarkation analysis only to the extent that it had some connection to the boarding process," and that, in this case, "the process of boarding a shuttle bus is not considered an operation of embarking or disembarking." (Doc. No. 11 at 12.) In opposition, Brannen maintains that his alleged activities are contemplated by Article 17, as he "was injured while engaged in the activity of immediately proceeding to his connecting flight" and did not stop to take part in any other activity along the way.[8] (Doc. No. 27 at 5-6.)

Tested against the controlling Third Circuit precedent, the activity in which Brannen was engaged—being transported on an inter-terminal shuttle bus—is insufficient to warrant the application of Article 17. While the plaintiffs' activities in Evangelinos were sufficient to withstand summary judgment, Brannen's complaint sets forth facts distinguishable from those in

---

[7] The Evangelinos court also noted that its conclusion as to the control prong was "supported by the fact that [the airline] service personnel were standing at [the gate], guiding the passengers, and [airline] security personnel were present." Evangelinos, 550 F.2d at 156. In the case at bar, though, Brannen's complaint does not include such facts that would warrant the conclusion that the "control prong" weighs in favor of applying the Montreal Convention. (Doc. No. 1.)

[8] Brannen points to a lack of "evidence that the Brannens loitered, shopped, ate, or stopped to do anything unrelated to making their connecting flight." (Doc. No. 27 at 6.) Brannen cites a district court case within the Second Circuit where the court deemed Article 17 inapplicable in part because "the plaintiff had ample time to roam freely about the [public] terminal before his flight was called," stating that the facts alleged in his complaint are different than those presented in that case. (Id.) (alteration in original) (quoting Hunter v. Deutsche Lufthansa AG, 863 F. Supp. 2d 190, 207 (E.D.N.Y. 2012)).

Evangelinos. There, "[t]he plaintiffs' injuries were sustained while they were acting at the explicit direction of [the airline], and while they were performing the final act required as a prerequisite to boarding busses employed by [the airline] to take [the plaintiffs] to the aircraft." Evangelinos, 550 F.2d at 156. Indeed, "for all practical purposes, 'the operations of embarking' had begun." Id. In this case, the complaint alleges only that Brannen was on his way to obtain his boarding pass to proceed to the connecting flight when he was injured.[9] (Doc. No. 1 at 22.) Comparing the facts alleged in Brannen's complaint to those in Evangelinos, Brannen's activities are simply too attenuated to the process of embarking on a flight. Thus, the third factor weighs in favor of dismissal. The Court finds that Plaintiff has failed to state a cognizable claim under Article 17 and will grant Defendants' motions to dismiss.

### B. Brannen's Request for Leave to Amend

Brannen requests that, if the Court orders dismissal of his complaint, he be given leave to amend his complaint.[10] He states that, if granted leave to amend, he would include the following additional facts:

> Some of Mr. Brannen's luggage was checked with the airlines from Newark, New Jersey, all the way through Marseille, France, and at the time of the accident, Mr. Brannen had not received that checked luggage. And, after arriving at Heathrow and prior to the accident, Mr. Brannen did not, and had no intention to, roam publicly for the purpose of eating at a restaurant, shopping, or doing anything other than making his connecting flight.

---

[9] Recognizing a potential similarity between his complaint and the complaint at issue in Adelson, 2017 WL 2265459, which Brannen cites in his opposition brief (Doc. No. 27), Brannen states that "[a]lthough Adelson's [c]omplaint did not contain enough facts [as to the nature of his activities], his opposition brief did, leading the [c]ourt to grant leave to amend." (Id. at 6.) According to Brannen, his complaint "already contains such facts" in that "[h]e had an e-ticket, [h]e traveled directly from Terminal 3 to Terminal 4 for the immediate purpose of making his connecting flight," [a]nd there is no evidence that he intended to, or did, engage in shopping or other detours." (Id. at 7.)
[10] Brannen points to Adelson, where the district court ordered that the complaint be dismissed but granted the plaintiff leave to amend his complaint. (Id. at 14.)

13

(Doc. No. 22 at 14.)

However, these proposed facts do not correct the fatal pleading deficiencies identified herein. Even assuming, however, that Brannen had already included such factual allegations in his complaint, the Court finds that these additional facts do not alter the Court's conclusion that Brannen was not in the course of embarking or disembarking so as to warrant application of the Montreal Convention, and, therefore, granting leave to amend in this instance would be futile. Accordingly, the Court will not permit Brannen leave to amend his complaint.

## IV. CONCLUSION

Based upon the foregoing, the Court will grant Defendants' motions to dismiss Brannen's complaint in their entirety. (Doc. Nos. 7, 22.) An appropriate Order follows.